FILED
2013 Mar-13 PM 12:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

2013 WL 775434
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

CITY OF WESTLAND POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

METLIFE, INC., et al., Defendants.

No. 12 Civ. 0256(LAK). | Feb. 28, 2013.

**Attorneys and Law Firms**

Armen Sohrabian, David Avi Rosenfeld, Darren J. Robbins, Samuel Howard Rudman, Shawn Anthony Williams, Thomas C. Michaud, Robbins Geller Rudman & Dowd LLP, for Plaintiff.

Elliot Greenfield, Kaitlin Teresa Farrell, Maeve L. O'Connor, Devevoise & Plimpton LLP, for Defendants Met Life, Inc., C. Robert Henrikson, William J. Wheeler, Peter M. Carlson, Steven A. Kandarian, William J. Mullaney, Sylvia Matthews Burwell, Eduardo Castro-Wright, Cheryl W. Grise, R. Glenn Hubbard, John M. Keane, Alfred F. Kelly, Jr., James M. Kilts, Catherine R. Kinney, Hugh B. Price, David Satcher, Kenton J. Sicchitano, and Lulu C. Wang.

Timothy E. Hoeffner, John J. Clark, Jr., DLA PIPER LLP (US), for Defendants Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., HSBC Securities (USA) Inc., Merrill Lynch. Pierce, Fenner & Smith Incorporated, and Wells Fargo Securities, LLC.

**Opinion**

**MEMORANDUM OPINION**

LEWIS A. KAPLAN, District Judge.

*1 Central States, Southeast and Southwest Areas Pension Fund has filed this securities case against MetLife, Inc., individual MetLife officers and directors, and MetLife's underwriters, purportedly on behalf of "all persons who purchased or acquired MetLife common stock [between February 2, 2010 and October 6, 2011] pursuant or traceable to the Company's August 3, 2010 public offering of 75 million shares of its common stock and MetLife's March 4, 2011 public offering of 68.5 million shares of its common stock, respectively (the 'Offerings')."[1] The amended complaint alleges violations of Section 10(b), Rule 10b–5 thereunder, and Section 20(a) of the Exchange Act, and Sections 11, 12(a)(2), and 15 of the Securities Act.

All defendants have moved to dismiss the amended complaint. For the reasons discussed below, the motions are granted part and denied in part.

*I. Parties*

Central States, Southeast and Southwest Areas Pension Fund is the alleged lead plaintiff on behalf of all members of the class.[2]

Defendant MetLife is a multinational insurance company.[3] During the class period, defendant C. Robert Henrickson was Chief Executive Officer and Chairman of the Board of Directors until he retired on May 1, 2011; defendant William J. Wheeler was Executive Vice President and Chief Financial Officer; defendant Peter M. Carlson was Executive Vice President, Finance Operations and Chief Accounting officer; defendant Steven A. Kandarian was initially Chief Investment Officer and then succeeded Henrickson as Chief Executive Officer; and defendant William J. Mullaney was President of U.S. Business (collectively, the "Individual Defendants").[4]

Plaintiff sues also MetLife directors Sylvia Mathews Burwell, Eduardo Castro–Wright, Cheryl W. Grise, R. Glenn Hubbard, John M. Keane, Alfred F. Kelly, James M. Kilts, Catherine R. Kinney, Hugh B. Price, David Satcher, Kenton J. Sicchitano, and Lulu C. Wang (collectively, the "Director Defendants").[5] MetLife, the Individual Defendants and the Director Defendants are referred to collectively as the "MetLife Defendants."

Finally, Plaintiff sues also MetLife's underwriters: Goldman Sachs & Co., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Wells Fargo Securities, LLC, Bank of America Merrill Lynch, Pierce, Fenner & Smith Incorporated, and HSBC Securities (USA) Inc. (collectively, the "Underwriter Defendants").

*II. The Complaint*
The Social Security Administration maintains a Death Master File ("SSA–DMF") in which it aggregates and publishes basic

information on all deceased persons whose deaths have been reported.[6] The SSA–DMF does not have a death record for all deceased persons, but it allegedly is reliable and relied upon by state and local governments, private citizens and companies, and others.[7]

Insurance companies, including MetLife, make regular use of the SSA–DMF in their businesses. Among MetLife's regular activities is the making of payments to annuity policy holders.[8] Its annuity business monitors the SSA–DMF.[9] When it finds that an annuitant has died, it ceases payments without any further proof of death.[10]

*2 MetLife has also large group and individual life insurance businesses. Historically, MetLife paid life insurance benefits to beneficiaries only upon the filing of a claim.[11] It did not monitor the SSA–DMF to determine when it needed to pay beneficiaries or, in the absence of a beneficiary, the relevant state government under state unclaimed property laws.[12]

In order to ensure that it was properly reserved for potential liability on its life insurance policies, MetLife estimated regularly and publicly reported the amount of benefits that it anticipated it would have to pay in the future.[13] Part of this determination involved estimating the number of insureds who had died, but whose beneficiaries had not yet filed a claim. The estimated benefits payable upon the deaths of such insureds formed part of MetLife's incurred but not reported ("IBNR") reserves.[14]

In 2007, MetLife allegedly cross-checked its individual life insurance records against the SSA–DMF and discovered that it held $80 million in benefits that should have, but had not been, paid because no claims for them had been filed.[15] The $80 million had accrued over a period of decades.[16] As the MetLife Defendants make clear in their motion papers, this $80 million represented only a small fraction of $40 billion of life insurance benefits that MetLife paid out over that decades-long period.[17] MetLife's method for developing its IBNR reserves thus appears to have been largely accurate, despite not drawing upon the SSA–DMF. Nevertheless, there was a small amount of IBNR claims, reserves for which were not captured in each quarterly estimate. Added together over time, they ultimately amounted to tens of millions of dollars.

The $80 million in unpaid benefits were due on individual, not group, life insurance policies. Despite allegedly knowing that a similar cross-check of the group life insurance records almost certainly would reveal similar additional liabilities, the company did not perform a cross check in 2007.[18] Instead, MetLife continued to report IBNR reserves that plaintiff alleges were materially inaccurate.[19]

In 2009, Florida and Illinois launched a market conduct examination into insurance companies' usage of the SSA–DMF.[20] Starting in 2010, the New York Attorney General began investigating whether MetLife was holding money in violation of state unclaimed property laws. The inquiry focused specifically on retained asset accounts, not on the company's failures to use the SSA–DMF in its life insurance business.[21] In its public filings, MetLife told investors that any allegations that its retained asset accounts were portrayed falsely or in violation of law were "without merit."[22]

On August 2, 2010 Met Life issued over 86 million shares of common stock to finance a purchase of AIG's American Life Insurance Company.[23] As part of that purchase, AIG acquired nearly 80 million shares of MetLife common stock as well as large amounts of equity units and convertible preferred stock.[24] AIG and MetLife agreed to a lock-up arrangement that prevented AIG from disposing of its MetLife shares for at least nine months and then permitted disposition only gradually.[25]

*3 On March 2, 2011, MetLife and AIG announced a large common stock offering to dispose of AIG's entire MetLife holdings.[26] The timing of the announced offering surprised investors because it came months before the termination of the lock-up agreement.[27] Plaintiff alleges that MetLife hurried to complete the offering because states had put pressure on MetLife to start using the SSA–DMF in its life insurance business, the result of which would have been large payments to states and beneficiaries, and hence downward pressure on share prices.[28]

In the months following the second offering, more states instituted investigations into life insurance companies' possible violations of unclaimed property laws.[29] In May 2011, MetLife executives testified publicly before officials in Florida and California.[30] They admitted that MetLife had not used the SSA–DMF to cross check its group life insurance

reserves, but acknowledged that it had used the SSA–DMF to cross check its individual life insurance reserves in 2007.[31] MetLife admitted to finding matches that resulted in additional payments to beneficiaries and states.[32] The executives detailed also how MetLife had used the SSA–DMF in other areas of its business.[33] They disclosed that MetLife had begun developing procedures in the summer of 2010 for broader use of the SSA–DMF, in part because of pressure exerted by the states.[34]

On August 5, 2011, MetLife disclosed in its second quarter report on Form 10–Q that more than thirty U.S. jurisdictions were investigating it for compliance with unclaimed property laws.[35] The company explained that "[i]t is possible that the audits and related activity may result in additional payments to beneficiaries [and others and changes to internal procedures]. The Company is not currently able to estimate the reasonably possible amount of any such additional payments or the reasonably possible cost of any ... changes in procedures, but it is possible that such costs may be substantial."[36]

Plaintiff alleges that this disclosure caused MetLife's stock value to drop. Between the close of the market on Thursday August 4, 2011 and the close of the market on Monday August 8, 2011, MetLife's stock dropped 11 percent.[37]

Two months later, on October 6, 2011, MetLife announced in a Form 8–K that it was taking a one-time $115 to $135 million after-tax charge to increase reserves to account for life insurance payments it discovered needed to be made after using the SSA–DMF to identify insured deaths.[38] The Form 8–K announced also two other unrelated charges for a total amount of $275 million. MetLife's stock price declined from $30.69 on October 6, 2011 to $28.80 on October 7, 2011.[39]

The amended complaint details a number of post class period events. For example, on December 5, 2011, the New York State Department of Financial Services issued a report claiming that insurers, including MetLife, for years had retained funds owed to the state.[40] And, in April 2012, MetLife reached a settlement agreement, allegedly valued at $500 million, with six states.[41] The settlement included financial penalties and business reforms. The MetLife Defendants' brief makes clear, however, that the only new cost to the company was a $53 million post-tax charge, $40 million of which went to the states to cover the costs of their investigations.[42] MetLife then entered into a separate settlement with New York State.[43]

**\*4** In sum and substance, plaintiff's argument is that MetLife issued financial statements and made public statements about its life insurance business that were materially false and misleading as a result of the MetLife Defendants' knowing failure to use the SSA–DMF to identify group life policy holders who had died. Read in the light most favorable to the plaintiff, the amended complaint alleges that MetLife had access to an accurate source of information to help determine life insurance IBNR reserves, knew that small inaccuracies in IBNR estimates had accrued over time to a material amount, failed to account for a needed increase in reserves until coming under pressure from state governments, and engaged in this conduct in order to inflate earnings and its stock price. MetLife allegedly knew also that its reported "mortality ratios," important indicators of solid underwriting, were inaccurate because they did not account for the policy holders who had died but whose beneficiaries had not made claims. As a result, every time that the MetLife Defendants made statements about IBNR reserves, mortality ratios, or the strength of the life insurance business in public filings or on earnings calls, they knew or should have known that the statements were inaccurate because the reported IBNR reserves and mortality ratios did not account for those deaths captured in the SSA–DMF but not in Metlife's estimates. The alleged misstatements in the company's public filings were incorporated into the registration statements for its August 2010 and March 2011 common stock offerings. When the alleged truth ultimately was revealed through two corrective disclosures, the value of Metlife's stock allegedly dropped, harming investors.

### III. The Motions to Dismiss

In deciding a motion to dismiss, a court ordinarily accepts as true all well pleaded factual allegations and draws all reasonable inferences in the plaintiffs favor.[44] In order to survive such a motion, however, a plaintiff must allege "sufficient factual matter ... 'to state a claim for relief that is plausible on its face.' "[45] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[46]

The MetLife Defendants and Underwriter Defendants each move to dismiss the complaint on the grounds that plaintiff

has failed to plead adequately any of the elements of the claims.

### A. Plaintiff's Section 10(b) and Rule 10b–5 Claims

To state a claim for relief under Section 10(b) and Rule 10b–5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) *scienter;* (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[47] All averments of fraud must be pled with particularity under the heightened pleading standards of Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act.[48]

**\*5** Here, plaintiff's Section 10(b) and Rule 10b–5 claims must be dismissed for failure to allege adequately loss causation.

### 1. August 5 Disclosure

Read in the light most favorable to the plaintiff the amended complaint alleges that MetLife's August 5 disclosure that state investigations could result in substantial payments was the materialization or partial corrective disclosure of a concealed risk—that MetLife had understated its necessary IBNR reserves and mortality ratios and withheld money due to beneficiaries and the states. Allegedly as a result of this disclosure, MetLife's common stock dropped 11 percent in value from August 4 to August 8. The amended complaint is remarkably misleading.

The amended complaint fails to mention that Standard & Poor's downgraded the credit rating of the United States for the first time in history after the market closed on Friday August 5, 2011.[49] The entire market dropped precipitously on the next trading day, Monday August 8. Between August 5 and August 8, the S & P 500 Index dropped 6.7 percent, the Dow Jones Industrial Average dropped 5.5 percent, and the Nasdaq Composite dropped 6.9 percent.[50] Insurers suffered nearly uniform declines in the same period. MetLife's stock dropped 9.9 percent in value, Prudential's stock dropped 10.8 percent in value, AFLAC's stock dropped 9.7 percent in value, Lincoln National's stock dropped 12.2 percent in value, and Manulife Financial's stock dropped 9.8 percent in value.[51]

In the one trading day after MetLife's disclosure but before the U.S. credit downgrade, MetLife's stock saw a minimal decline in value. MetLife filed its Form 10–Q before the stock market opened on August 5, 2011. The stock opened *up* at $37.49 and closed at $36.35, just slightly below (i.e., 1.5%) the previous day's close.[52] Plaintiff responds that MetLife stock reached an intra-day low of $34.93 on August 5.[53]

While loss causation often is a fact specific question appropriate for trial, "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately ple[ ]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events."[54] Given the precipitous drop in the market, and the nearly equal drop in value across major life insurance companies, plaintiff was obliged to allege factual matter sufficient to "disaggregate those losses caused by the [downgrade in U.S. credit rating] from disclosures of the truth behind the alleged misstatements,"[55] In other words, plaintiff was obliged to "allege[ ] facts that would allow a factfinder to ascribe some rough proportion of the whole loss to the ... misstatements."[56]

The amended complaint fails even to acknowledge the U.S. credit downgrade and the accompanying upheaval in the marketplace between August 5 and August 8. It certainly does not allege facts sufficient to allow a factfinder to ascribe any portion of the loss to the alleged misstatements. Instead, plaintiff misleadingly attempts to attribute the entire drop in stock value to the alleged corrective disclosure. Plaintiff does not address the fact that, just *after* the alleged corrective disclosure, MetLife stock opened on August 5 at $.59 higher than its August 4 closing price and then closed only $.55 below. Plaintiff does not provide any basis for suggesting that the market considered these investigations to be material or the cause of the price drop.[57] The market upheaval and MetLife's stock performance renders plaintiff's allegations insufficiently plausible to withstand a motion to dismiss.[58]

### 2. October 6 Disclosure

**\*6** Plaintiff's loss causation allegations relating to the October 6, 2011 disclosure fail for similar reasons. A comparison of MetLife's stock performance with that of other major insurers reveals that they traded in lockstep with one another throughout October 2011.[59] The MetLife Defendants submitted with their briefing a chart tracking the stock movements of several major life insurers in 2011.[60] On

October 6, all of the insurers' stock lost value in nearly equal proportions.[61] All of the stocks then recovered nearly in full within a matter of days.[62] This lockstep trading decreases the prospect that the loss was caused by the alleged disclosure. Without more, the loss causation allegations are insufficient to withstand the motion to dismiss.[63]

### B. Plaintiff's Sections 11 and 12(a)(2) Claims

To state a claim under Section 11, a plaintiff must allege that: "(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein not misleading.' "[64]

To plead a sufficient claim under Section 12(a)(2), a plaintiff must allege that: "(1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit [ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.' "[65]

### 1. Misstatements and Omissions

The defendants argue that plaintiff has failed to allege any actionable misstatements or omissions. They contend that the alleged statements were statements of opinion, that there is no factual basis pled for concluding that the opinions expressed were not honestly held, and that any alleged omissions are not actionable because there was no duty to disclose.

### a. Statements of Opinion[66]

In order to state a claim based on a statement of opinion, a plaintiff must allege adequately that the opinion proved inaccurate and that it was not believed by the speaker when given.[67] IBNR reserves are statements of opinion they capture "losses for which claims have not been reported but must be estimated so the company can pay future claims."[68] While these estimates involve some factual inputs, they necessarily require judgment. The existence of the SSA–DMF does not make life insurance IBNR reserves a factual statement. Among other reasons, the Social Security Administration acknowledges that the database is neither complete nor entirely accurate.

Plaintiff has alleged adequately that MetLife's IBNR reserves proved to be objectively insufficient to meet the company's life insurance policy obligations. The key question at this stage is whether plaintiff has alleged that the defendants did not actually believe the IBNR reserve estimates to be accurate estimates of needed reserves when reported "or knew that [they] had no reasonable basis for [those estimates]."[69]

*7 The amended complaint alleges that after running the SSA–DMF against a portion of the life insurance policies in 2007 and discovering a reserve shortfall of $80 million dollars, MetLife knew that its method for setting IBNR reserves over the previous several decades had not accounted for all deceased policy holders. As a result, the company knew that its estimated IBNR reserves were insufficient to meet the companies life insurance policy obligations, or at least was aware that it had no reasonable basis for believing the estimates.[70] Senior company executives allegedly testified to this effect before two state panels. This is sufficient to plead that MetLife either did not believe the accuracy of its statements or actually knew that there was no reasonable basis for its estimates, which amounts to much the same thing.

The MetLife Defendants' reliance on *City of Omaha, Neb. Civilian Emps. Ret. Sys. v. CBS Corp.*[71] is misplaced. The Second Circuit there held that the complaint failed to allege that the defendants were aware of facts that should have caused them to begin interim impairment testing of the company's goodwill, which was based on estimation.[72] The court went on to say that even if the complaint had so alleged, it had not alleged that the defendants did not believe their statements about goodwill.[73] It did not hold that, even if the defendants knew that testing would likely have revealed a goodwill impairment, they were not obligated to do so promptly and to report accurately the results.[74]

### b. Duty to Use the SSA–DMF

The MetLife Defendants argue that none of the alleged misstatements or omissions is actionable because "[p]laintiff has identified no law, rule, regulation or principle of accounting in effect during the putative class period that required insurance companies to affirmatively search the DMF—or any other source—for deceased policyholders, nor can it."[75] This argument misses the point.

MetLife was obligated to report its life insurance IBNR reserves. As a result of its 2007 SSA–DMF cross-check, the company knew that its method for setting reserves ignored facts that strongly suggested that reserves were understated, i.e., knew that use of the SSA–DMF likely would have resulted in higher reserves and thus cast doubt on the reasonableness of its estimates. But it failed to make use of the database. Whether or not a law required specifically that MetLife use the SSA–DMF is irrelevant.

### c. Duty to Disclose State Investigations

The amended complaint alleges that the defendants had a duty to disclose the pending state investigations prior to August 5, 2011 under Item 103 of SEC Regulation S–K.[76] But the state investigations were not pending legal proceedings and thus Item 103 is inapplicable.[77]

Plaintiff next argues that FASB Accounting Standards Codification 450–20 ("ASC 450") required disclosure. That argument fails for the same reason, viz. that the state investigations were not pending or threatened litigation.

*8 Finally, plaintiff argues that disclosure was required under Item 303 of regulation S–K.[78] Item 303 requires disclosure of "any known ... uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations ." Instruction 3 to Item 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."[79]

The amended complaint alleges that states had begun to pressure MetLife to use the SSA–DMF in its life insurance business by late the summer of 2010.[80] The MetLife Defendants reasonably should have expected that the state investigations would cause MetLife to alter its IBNR reserves. There was potential also for state fines for failure to comply with unclaimed property laws. Indeed, once MetLife disclosed the investigations in August 2011, it admitted that it could not predict the exact financial consequences, but that they could be substantial. Assuming these facts to be true, plaintiff has alleged adequately that MetLife had a duty under Item 303 to disclose the state investigations before August 2011.[81]

### 2. Materiality

A misstatement is material where "there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [act]."[82] Materiality is a mixed question of law and fact that should not be decided on a motion to dismiss unless no reasonable trier of fact could find the alleged misstatements to be material.[83] Here, the alleged corrective disclosures included the announcement of a nation-wide investigation into one of MetLife's important businesses and an increase in reserves that caused operating earnings for insurance products to be down 23 percent for the quarter. Plaintiff alleges that MetLife's shares dropped in value after the disclosures. This is sufficient.

### 3. Loss Causation

Plaintiff has stated claims under Sections 11 and 12(a)(2) of the Securities Act because, as discussed above, plaintiff has pled adequately that MetLife made misstatements in its Forms 10–K and 10–Q that were incorporated into the registration statements. The MetLife and Underwriter Defendants argue that these claims nevertheless should be dismissed for absence of loss causation.

Plaintiff is not required to allege loss causation in order to withstand a motion to dismiss claims under Sections 11 and 12(a)(2). Loss causation is an affirmative defense, the burden of proof for which rests with the defendant. It is proper, however, to dismiss a complaint where "it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses,"[84]

While plaintiff has not pled adequately loss causation for the purposes of its Section 10(b) and Rule 10b–5 claims, it is not apparent from the face of the complaint that plaintiff will be unable to recover based on either the August 5 or October 6, 2011 disclosures. While defendants may prove that the drops in stock value were due to other market forces, that possibility is insufficient to defeat claims under Sections 11 and 12(a)(2) on a motion to dismiss.

### 4. Section 11 Claims

*9 Defendants Kandarian and Mullaney are not alleged to have been MetLife directors or to have signed the

registration statements at issue. The Section 11 claims should be dismissed as to these defendants only.[85]

### 5. Section 12(a)(2) Claims

The Individual and Director Defendants argue that the amended complaint fails to allege that they were "statutory sellers" and that the Section 12(a)(2) claims therefore should be dismissed. The Individual and Director Defendants were statutory sellers "only if they (1) directly passed title to the securities, or (2) solicited the purchase of securities out of a desire to (a) serve their own interests or (b) serve the interests of the securities' owner."[86] Defendants claim that plaintiff has failed to allege facts demonstrating that they were motivated to serve their own financial interests. It is not necessary, however, to resolve this issue because plaintiff has failed adequately to allege the requisite solicitation.

Plaintiff attempts to allege solicitation by the director defendants based on the fact that they signed the registration statements. In *Citiline Holdings, Inc. v. iStar Financial Inc.*, Judge Sullivan held, contrary to the decisions of some courts within this district, that signing a registration statement does not itself constitute solicitation under Section 12(a)(2).[87] Judge Sullivan noted that "[e]very Court of Appeals to have considered the issue ... has held that an individual's signing a registration statement does not itself suffice as solicitation under Section 12(a)(2)."[88] He further explained that "[w]hile Section 11 expressly imposes liability upon every signer of the registration statement. Section 12 does not do so. Plaintiffs' position would render this distinction a nullity and is, in any event, inconsistent with [the Supreme Court's] statement that Congress did not intend to impose liability under Section 12 'for mere participation in unlawful sale transactions.'"[89] While the Second Circuit apparently has yet to address the issue, at least one court in this district has adopted Judge Sullivan's logic.[90] This Court agrees with Judge Sullivan as well.

*Citiline* did not hold only that signing a registration statement is insufficient to constitute solicitation. It held also that high ranking corporate officers who allegedly made material misrepresentations directly to investors at a corporate investor day (as in this case) were not statutory sellers.[91] Here, just as in *Citiline,* the amended complaint is "largely silent as to the role played by the Individual and Director Defendants in the solicitation of the securities at issue."[92]

The Section 12(a)(2) claims against the Individual and Director Defendants are dismissed.

### 6. Claims Against Underwriter Defendants

Plaintiff has alleged adequate Securities Act claims against the Underwriter Defendants. Neither Goldman Sachs nor Citigroup, however, underwrote the August 2010 offering. To the extent that the amended complaint makes claims against those two underwriters for the August 2010 offering, those claims should be dismissed.

### C. Control Person Claims

*10 Plaintiff seeks to hold the Individual Defendants and Director Defendants liable as control persons under Section 15 of the Securities Act.[93] To state a claim based on a control person theory, a plaintiff must allege a primary violation of Sections 11 or 12(a)(2) and actual control over the primary violator by the defendants.[94] Control is defined as "the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise."[95] "Neither director status nor mere membership on an audit committee, standing alone, is sufficient to demonstrate actual control over a company or an allegedly fraudulent transaction."[96] A distinction exists between outside directors and high-ranking officers; corporate officers usually are presumed to possess the ability to control the actions of their employees.[97] Directors and officers who sign registration statements or other SEC filings are presumed to control those who draft those documents.[98] And where a plaintiff alleges that the directors and officers participated in the alleged primary conduct, that is sufficient to state a claim for control person liability.[99]

As explained above, plaintiff has alleged a primary violation. It remains only to be seen whether plaintiff has alleged adequately control as to each defendant.

### 1. C. Robert Henrickson, CEO and Chairman of the Board

Plaintiff has alleged adequately that Henrickson had actual control. As an inside director and Chief Executive Officer, he had the ability to control the actions of his subordinates. In addition, he signed the financial statements, indicating that

he had control over those who drafted them. And he made allegedly misleading public statements.

### 2. William J. Wheeler, Executive Vice President and CFO

Plaintiff has alleged adequately that Wheeler had actual control. As Chief Financial Officer, Wheeler signed MetLife's financial statements and attested to their accuracy. He allegedly made public misstatements on earnings calls. And he is alleged to have participated in creating processes for broad use of the SSA–DMF in 2010.

### 3. Peter M. Carlson, Executive Operations and Chief Accounting Officer

Plaintiff has alleged adequately that Carlson had actual control. Carlson oversaw MetLife's accounting and signed MetLife Forms 10–Q and 10–K.

### 4. Steven A. Kandarian, Chief Investment Officer

Plaintiff has alleged adequately that Kandarian had actual control. He was a high-raking corporate officer that participated in earnings calls and made certain of the alleged misstatements.

### 5. William J. Mullaney, President of U.S. Business

Plaintiff has alleged adequately that Mullaney had actual control. He oversaw MetLife's U.S. business operations and issued alleged misstatements on quarterly earnings calls.

### 6. Director Defendants

Plaintiff has alleged adequately that the Director Defendants, except Eduardo Castro–Wright, had actual control. They were board members and signed various financial statements and registration statements that contained the alleged misstatements. Castro–Wright is alleged only to have served as a director, not to have signed any financial or registration statements. These allegations are insufficient to show that he had actual control.

\* \* \*

**\*11** The Court has considered the plaintiff's remaining contentions and finds them to be without merit.

### Conclusion and Order

For the foregoing reasons, the Court grants the motions [DI 38, 42] to the extent they seek dismissal of the Exchange Act claims, dismissal of the Section 11 claims against Kandarian and Mullaney, dismissal of the Section 12(a)(2) claims as to the Individual and Director Defendants and dismissal of the Section 15 claim against Castro–Wright. The motions are denied in all other respects.

SO ORDERED.

**Exhibit V: Comparison of Share Prices of MetLife and Major Life Insurance Companies**

MetLife, Inc. — Shaded blue area
Prudential Financial Inc. — Red line
AFLAC Inc. — Brown line
Lincoln National Corp. — Green line

August 2011:



October 2011:



Footnotes

1      Amended Complaint ¶¶ 1, 2 (hereinafter "¶ ___").
2      ¶ 29.
3      ¶ 30.
4      ¶¶ 31–35.
5      ¶¶ 37–48.
6      ¶ 4.
7      *Id.*
8      ¶ 5.
9      *Id.*
10     *Id.*
11     *See* ¶ 7.
12     ¶ 6. The MetLife defendants explain in their motion papers that MetLife used the SSA–DMF to stop annuity payments because the families of deceased annuitants have no incentive to notify the insurer and stop payments. The opposite is true for life insurance policies. Life insurance beneficiaries have every incentive to file a claim, thus lessening the need to search affirmatively the SSA–DMF. DI 43 at 9 n. 3.
13     *See* ¶¶ 7–10.
14     ¶¶ 9–10; DI 43 at 10–11.

| | |
|---|---|
| 15 | ¶¶ 86, 106, 120, 123, 162. |
| 16 | *Id.*; DI 43 at 3. |
| 17 | *See* DI 43 at 1617. |
| 18 | ¶ 123. |
| 19 | ¶ 86. |
| 20 | ¶ 209. |
| 21 | ¶ 11. |
| 22 | ¶ 14. |
| 23 | ¶ 90. |
| 24 | ¶¶ 70–71. |
| 25 | *Id.* |
| 26 | ¶¶ 104–105. |
| 27 | *Id.* |
| 28 | ¶¶ 105–108. |
| 29 | ¶¶ 116, 121, 125. |
| 30 | ¶ 121. |
| 31 | ¶ 123. |
| 32 | *Id.* |
| 33 | *Id.* |
| 34 | *Id.* |
| 35 | ¶ 132. |
| 36 | *Id.* |
| 37 | ¶ 134. |
| 38 | ¶ 135. |
| 39 | ¶ 139. |
| 40 | ¶ 144. |
| 41 | ¶ 146. |
| 42 | DI 43 at 78. |
| 43 | ¶ 49. |
| 44 | *See Levy v. Southbrook Int 'l Invs., Ltd.*, 263 F.3d 10. 14 (2d Cir.2001), *cert. denied*, 535 U.S. 1054, 122 S.Ct. 1911, 152 L.Ed.2d 821 (2002). |
| 45 | *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). |
| 46 | *Id.* |
| 47 | *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008) (italics added); *see* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5. |
| 48 | 15 U.S.C. § 78u–4(b)(2); Fed.R.Civ.P. 9(b); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001). |
| 49 | "The court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). |
| 50 | Greenfield Decl. Ex. U. The Court "may take judicial notice of well-publicized stock prices." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n. 8 (2d Cir.2000). |
| 51 | *Id.* |
| 52 | DI 43 at 35. |
| 53 | DI 45 at 36. |
| 54 | *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 174 (2d Cir.2005) (citing *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir.1994) (internal quotation marks omitted). |
| 55 | *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir.2009). |
| 56 | *Luttanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir.2007). |
| 57 | Plaintiff does cite one article that briefly describes the disclosure without commenting on it in any way. ¶ 133. |
| 58 | *See Lentell*, 396 F.3d at 174. |

59 DI 43 at 38.
60 *See* Exhibit 1 (attached hereto).
61 *Id.*
62 *Id.*
63 *See Lentell*, 396 F.3d at 174.
64 *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir.2010) (citing 15 U.S.C. § 77K(a)).
65 *Id.* at 359 (quoting 15 U.S.C. § 77*l*(a)(2)).
66 Plaintiff argues also that MetLife's financial statements contained material misstatements because they did not comply with GAAP. Assuming that the relevant GAAP provisions required disclosure, the allegations add nothing. There is no need to discuss them separately.
67 *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110, 113 (2d Cir.2011).
68 *See Delta Holdings, Inc. v. Nat. 'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1229 (2d Cir.1991).
69 *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F.Supp.2d 258, 302 (S.D.N.Y.2011).
   The Second Circuit affirmed this Court's decision in *Fait v. Regions Fin. Corp.*, 712 F.Supp.2d 117 (S.D.N.Y.2010), in relevant part on the basis that the complaint did not "plausibly allege that defendants did not believe the statements" of opinion there at issue without discussing whether allegations that the statements were made in the knowledge that the defendants had no reasonable basis for them would have sufficed. *Id.*, 655 F.3d at 112. That is because the issue was not presented. As this Court's decision made clear, the plaintiff in *Fait* "disclaim[ed] any allegation that defendants knowingly *or recklessly* misstated Regions' loan loss reserves' " and goodwill. 712 F.Supp.2d at 122 (goodwill), 124–25 (loan loss reserves) (emphasis added). Moreover, the Circuit previously had suggested that knowing disregard of the inadequacy of loss reserves would render a statement as to its reserves actionable. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir.1994). The Tenth Circuit previously had made clear that an auditor's opinion made without a reasonable basis would be actionable. *Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1176 (10th Cir.2006). Yet there is nothing in *Fait* to suggest that it was altering the principle articulated in *Shields* or creating a circuit conflict with *Deephaven*. Accordingly, the Circuit's decision in *Fait* is not properly read as suggesting that statements of opinion made in the knowledge that the opinions expressed were baseless are not actionable misstatements. Even if so intended, it would be *dictum* on that point and not binding here.
70 *See, e.g.*, ¶ 106.
71 679 F.3d 64 (2d Cir.2012).
72 *Id.* at 68.
73 *Id.*
74 *Id.*
75 DI 43 at 2.
76 17 C.F.R. § 229.103
77 *See Richman v. Goldman Sachs Grp.*, 868 F.Supp.2d 261, 272 (S.D.N.Y.2012) (holding that an SEC Wells Notice did not trigger a duty to disclose under Item 103).
78 17 C.F.R. § 229.303.
79 *Id.*, instruction 3; *Pan ther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir.2012).
80 ¶ 123.
81 *See Litwin v. Blackstone Grp.*, 634 F,3d 709, 71820 (2d Cir.2011).
82 *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir.2009) (quoting *Basic v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting in turn *TSC Indus., Inc. v. Northway. Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976))).
83 *Id.*
84 *In re Merrill Lynch Investment Mgmt. Funds Sec. Litig.*, 434 F.Supp.2d 233, 238 (S.D.N.Y.2006).
85 15 U.S.C. § 77k(a).
86 *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F.Supp.2d 506, 512 (S.D.N.Y.2010) (citing *Pinter v. Dahl*, 486 U.S. 622, 642, 647, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)).
87 *Id.*
88 *Id.*
89 *Id.* (citing *Pinter*, 486 U.S. at 650).
90 *See McKenna v. Smart Techs. Inc.*, No. 11 Civ. 7673(KBF), 2012 WL 1131935, at *18 (S.D.N.Y. Apr.3,2012).

91  *Citiline Holdings*, 701 F.Supp.2d at 510, 512.
92  *Id.* at 512.
93  Plaintiffs § 20(a) claims are dismissed for failure to plead an underlying violation of § 10(b).
94  *See In re Lehman Bros. Mortgage–Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir.2011).
95  *Id.* (citing *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 147–273 (2d Cir.1996)).
96  *In re Satyam Computer Servs. Ltd. Sec. Litig.*, —— F. Supp .2d ——,2013 WL 28053, at *25 (S.D.N.Y Jan.02, 2013).
97  *In re Alstom SA*, 406 F.Supp.2d 433, 488 n. 51 (S.D.N.Y.2005); *see In re Moody's Corp. Sec. Litig.*, 599 F.Supp.2d 493, 517 (S.D.N.Y.2009) (finding allegations that individual defendants were high-ranking officers were sufficient to give the defendants fair notice of the grounds for the claims against them).
98  *See In re Alstom SA*, 406 F.Supp.2d at 487–88.
99  *See Emps. Ret. Sys. of the Gov. of the V.I. v. J.P. Morgan Chase & Co.*, 804 F.Supp.2d 141, 157 (S.D.N.Y.2011).

**End of Document**  © 2013 Thomson Reuters. No claim to original U.S. Government Works.